**MONONGAHELA POWER CO., Plaintiff,**

v.

**Alan R. SCHRIBER, Chairman of the Public Utilities Commission of Ohio, et al., Defendants.**

No. C2–04–084.

United States District Court, S.D. Ohio, Eastern Division.

May 19, 2004.

Order Modifying Opinion on Partial Grant of Reconsideration June 14, 2004.

Daniel R. Conway, Kathleen M. Trafford, Jay A. Yurkiw, Porter, Wright, Morris & Arthur, Columbus, OH, Gary A Jack, Fairmont, WV, for Monongahela Power Company, Plaintiff.

Thomas Gerard Lindgren, Ohio Attorney General, Antitrust Section, Columbus, OH, Thomas William McNamee, Ohio Attorney General, Columbus, OH, for Ronda Hartman Fergus, Alan R. Schriber, Clarence D. Rogers, Jr., Donald L. Mason, Judith A. Jones, Defendants.

C. M. Naeve, Matthew W. S. Estes, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, Roger Philip Sugarman, Kegler, Brown, Hill & Ritter, Columbus, OH, for Industrial Engergy Users Ohio, Movant.

Douglas G. Robinson, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, Jeffrey L. Small, Ohio Consumers' Counsel, Columbus, OH, for Ohio Consumers Counsel, Movant.

## OPINION AND ORDER

SARGUS, District Judge.

On February 2, 2004, Plaintiff, Monongahela Power Company ("Mon Power"), filed a Complaint for Declaratory and Injunctive Relief and a Motion for Preliminary Injunction. Mon Power brings this action against Defendants, Alan R. Schriber, Ronda Hartman Fergus, Judith A. Jones, Donald L. Mason and Clarence D. Rogers, Jr. (collectively "Defendants" or "Commissioners"), in their official capacities as Commissioners of the Public Utilities Commission of Ohio ("PUCO"). For the reasons that follow, Mon Power's Motion for a Preliminary Injunction is **GRANTED IN PART.**

### SUMMARY

As is described in detail, *infra*, Mon Power brings two separate, but related, constitutional claims against the Commissioners. In the first count, Mon Power asserts that the PUCO has unlawfully prevented it from recovering in retail rates chargeable to industrial and large commercial consumers wholesale power rates approved by the Federal Energy Regulatory Commission ("FERC"). Because the Supremacy Clause of the Constitution provides that federal law, if constitutionally enacted, supersedes state law, Mon Power contends that the actions of the PUCO are unconstitutional.

In its second claim, Mon Power contends that the provisions of the Ohio Restructuring Act, which over a five and one-half year period ushers in a new system of electrical utility deregulation and competition, are unconstitutional in requiring a rate freeze during such lengthy period. Mon Power contends that the rates which it is permitted to charge are so low as to constitute a confiscatory taking of private property, in violation of the Due Process Clause of the Fourteenth Amendment.

The deregulation scheme at issue is both broad and complex. This Court is acutely aware of several important jurisprudential principles which bear on the relief sought by Mon Power. First, rates chargeable to consumers of electricity are the primary responsibility of state government under a

longstanding statutory scheme enacted by Congress. Second, utility rate regulation is highly complex and traditionally entrusted in the first instance to an administrative agency, such as the PUCO. Third, statutory enactments involving utility regulation, such as the Ohio Restructuring Act, contain many components. Modification or elimination of one part of the scheme may adversely impact a unitary system enacted by the Ohio Legislature. Fourth, and most importantly, decisions of the PUCO are reviewable under Ohio law by the Ohio Supreme Court. This Court is most reluctant to permit a bypass of this process.

Notwithstanding these concerns, the Ohio Restructuring Act includes a rate-freeze provision which, under binding precedent from the Supreme Court and the Sixth Circuit Court of Appeals, must fail if no provision is made for consideration by the PUCO of a claim that a frozen rate is confiscatory. Mon Power, as an Ohio public utility, is required to provide electric services to Ohio customers within its service area during the transition period established under the Ohio Restructuring Act. It cannot, consistent with the Constitution, be required to provide such service and in return receive a rate which is confiscatory, that is, a rate that does not permit recovery of actual costs together with a fair return. The PUCO, in finding that it lacked jurisdiction to resolve Mon Power's constitutional claims, concluded that it was required by Ohio law to freeze electrical rates through December 31, 2005.[1]

The relief afforded in this Opinion and Order is designed to be narrow in recognition of the jurisprudential principles set forth above. The rate freeze is found to be unconstitutional only to the extent that it fails to provide a mechanism by which the PUCO may review claims by utilities that rates are confiscatory. Consequently, it is for the PUCO, and not this Court, to determine, after appropriate fact finding, whether such claims have merit. Further, the PUCO is also directed to consider all relevant provisions of the Ohio Restructuring Act—including tax reductions, transition fees and other benefits to Mon Power—to determine whether the rates, together with these beneficial provisions of law, are confiscatory.

### I.

Mon Power seeks a declaration that the rate-freeze provisions in state legislation known as the Restructuring Act, Ohio Rev. Code § 4928.40 et seq., which introduces competition in the state's traditionally regulated electric industry, are facially unconstitutional and violate the Fourteenth Amendment to the Untied States Constitution. Mon Power seeks an injunction enjoining Defendants, the Commissioners of the PUCO, from applying a process that denies Mon Power an opportunity to present evidence that the current retail-rate structure for the price of electricity chargeable to large commercial and industrial customers is confiscatory and violates the Due Process Clause of the Fourteenth Amendment.[2] Mon Power also contends that it is constitutionally entitled to recover in approved rates a just and reasonable return on the wholesale rate of electricity that it purchases pursuant to a rate filed and authorized by the FERC. To that end, Mon Power seeks a declaration that the

---

**1.** The Ohio Restructuring Act does allow for an earlier termination of the freeze if twenty percent of Mon Power's customers obtained services from an alternative electric utility or that effective competition existed in the service area. The Court notes that both of these

contingencies are beyond the control of Mon Power.

**2.** The issues raised in this case only affect Mon Power's industrial and large commercial customers. The rates chargeable to residential customers are not at issue in this case.

rates established by the PUCO conflict with the filed-rate doctrine and violate the Supremacy Clause of the Constitution. Mon Power seeks an injunction requiring Defendants to issue an order that allows Mon Power to charge retail rates that allow a just and reasonable return on the costs it is incurring under its current power supply agreement.

Defendant–Commissioners argue that the Court has no jurisdiction over the subject matter of this case in light of the Johnson Act, 28 U.S.C. § 1342 *et seq.*, or, alternatively, that the Court should abstain from adjudicating this matter and permit state judicial review to proceed without disruption. Following oral argument on this issue, the Court made an initial determination that it had jurisdiction over the subject matter of this case sufficient to proceed to the hearing on Mon Power's Motion for Preliminary Injunction. On the merits, Defendant–Commissioners contend that the rate-freeze provisions of the Ohio Restructuring Act are neither facially invalid as confiscatory nor violate the federal filed-rate doctrine.

This matter is now before the Court for final disposition of the Commissioner's Memorandum on Jurisdiction, which the Court construes as a Motion to Dismiss for lack of subject matter jurisdiction. For the reasons that follow, that Motion is **DENIED.** The Court also addresses Mon Power's Motion for Preliminary Injunction on the merits, which for the following reasons, is **GRANTED IN PART AND DENIED IN PART AS MOOT.**

## II.

### A. The State Restructuring Act

On June 22, 1999, the 123rd Ohio General Assembly passed Am. Sub. S.B. 3 (the "Restructuring Act"), now codified at Ohio Revised Code Chapter 4928. The purpose of the legislation was to eliminate the traditional method of regulating power services. Under the terms of the Restructuring Act, electric utilities in Ohio are required to implement a transition plan that will give their retail customers the right to purchase electricity from competing retail suppliers. *See* Ohio Rev. Code § 4928.31. The Restructuring Act also requires the utilities to reorganize their operations into at least three component parts so as to facilitate meaningful competition among the various functions of generating, transmitting and delivering power.

Ohio Rev.Code § 4928.40 obligates the utilities to provide for a "market development period" during which time the rates chargeable to retail customers are frozen at pre-Restructuring Act levels. By statute, the market development period and the corresponding rate freeze end on December 31, 2005. Ohio Rev.Code § 4928.40(B)(2). The PUCO, however, is authorized by statute to issue an order permitting an earlier termination date if 20 percent of the utility's load has switched suppliers or if it finds that effective competition exists in the utility's territory. Ohio Rev.Code § 4928.40(B)(2)(a) & (b).

### B. Stipulation Regarding Transition Plan and PUCO October 5, 2000 Order

Consistent with its obligations under the new Restructuring Act, on January 3, 2000, Mon Power filed a proposed transition plan. (Blankenship Aff. ¶ 6[3]; Att. B, PUCO Oct. 5, 2000 Order at p. 1.) The PUCO initiated proceedings and undertook a review of Mon Power's proposal. After negotiations, the parties to the proceeding,

---

**3.** Unless otherwise noted, all further citations refer to the Affidavit of George B. Blankenship and the documents attached to it, submitted in support of Plaintiff's Motion for Preliminary Injunction.

including Mon Power, the PUCO's staff, a coalition of Mon Power's industrial customers and other interested interveners, executed a Stipulation and Recommendation (the "Stipulation") which was designed to resolve the proceedings by agreement. (Att.A, Stipulation.) Section IV of the Stipulation, entitled "FROZEN RATES AND MARKET DEVELOPMENT PERIOD," provides in pertinent part:

> Ohio Revised Code § 4828.40(B)(2) provides that the market development period shall not end earlier than December 31, 2005, unless, upon application by the electric utility, the Commission authorizes an earlier termination date for one or more customer classes based upon a finding that there is a 20 percent switching rate load by the customer class or that effective competition exists in the utility's certified territory. By this Stipulation, Monongahela Power, supported by the other Signatory Parties, applies to the Commission for authorization of a market development period termination date for industrial and large commercial customers of December 31, 2003, based upon the agreement to forego the recovery of transition costs beyond that date (see Ohio Revised Code § 4928.38).

(Stipulation, Section IV, p. 4.) Accordingly, the Stipulation referred to December 31, 2003 as the termination date of the market development period and the corresponding end of the retail-rate freeze under the Restructuring Act for Mon Power's large commercial and industrial customers.[4]

On June 22, 2000, Mon Power filed the Stipulation with the PUCO. (PUCO Order, Oct. 5, 2000, at p. 2.) On October 5, 2000, after an evidentiary hearing, the PUCO issued an order summarizing, analyzing and approving the Stipulation. The PUCO

Order referenced that, under the Stipulation, a regulatory transition charge would be in effect for the market development period and that, for Mon Power's large commercial and industrial customers, the charge would end on December 31, 2003. (*Id.* at Section K, at p. 10.) The PUCO's order concluded that "[t]he company's transition plan, as modified by the Stipulation, satisfies the requirements of [the Restructuring Act], and is approved to the extent set forth herein." (*Id.* at p. 15.) While the PUCO made minor revisions to other provisions in the Stipulation, it did not alter any of the terms relating to the termination of the market development period for Mon Power's large commercial and industrial customers on December 31, 2003. Neither Mon Power nor any of the signatories or interveners to the Stipulation sought rehearing or appealed the PUCO's order approving the Stipulation.

In accordance with the terms of the Stipulation, Mon Power reorganized its corporate structure in preparation for retail competition. Pursuant to Section VII of the Stipulation, Mon Power transferred ownership of its electric generation facilities to its newly-formed affiliate, Allegheny Energy Supply Company, LLC ("Allegheny Supply"). As required by the PUCO's October 5, 2000 Order, Mon Power filed tariffs implementing the rates required by the Stipulation. The tariffs that Mon Power filed showed the frozen rates applicable to large commercial and industrial customers terminating on December 31, 2003. These tariffs were approved by the PUCO.

## C. Mon Power's Power Supply Agreement with Allegheny Supply

After Mon Power transferred ownership of its generation facilities to Allegheny

---

**4.** Section IV of the Stipulation also provided that the market development period for Mon Power's residential and smaller-load customers would end on the statutory termination date of December 31, 2005. These customers and the corresponding market development termination date are not at issue in this case.

Supply, the two business entities executed a Power Sales Agreement.[5] The Power Sales Agreement defines the terms of the parties' arrangement for Mon Power's purchase of wholesale power from Allegheny Supply, including associated costs and anticipated volumes for various classes of Mon Power's customers. (Att. C, Power Sales Agreement.) Of the numerous provisions in Power Sales Agreement, two stand out as particularly relevant here. First, in the definitions section of the Agreement, the term "Default Service" references the afore described "Settlement":

> "Default Service" means [Mon Power's] obligation to provide generation service to all retail customers within its Ohio jurisdiction, according to statutory and regulatory requirements as well as the Settlement less any amounts of such obligation as [Mon Power] may have satisfied ...

(Power Sales Agreement, Art. I, Definitions.)[6] Second, Article 6, Section 7.1 relating to the price of wholesale power is divided into categories of power based on the different classes of customers that Mon Power would serve during the retail rate freeze. Pricing is further delineated by prospective calendar years and the estimated price of power per megawatt hour for that calendar year. In this provision of the Power Sales Agreement, the rate Mon Power was required to pay for wholesale power remained constant in the years 2001, 2002 and 2003, but changed and essentially increased beginning in the first quarter of 2004 through the last quarter of 2005. These provisions, taken separately or together, demonstrate that, based upon the Stipulation approved by the PUCO, Mon Power expected the rates for its large commercial and industrial customers would change after December 31, 2003.

Since the time that the PUCO approved the Stipulation in October of 2000, the average market price for electricity in Mon Power's region has risen significantly. As of December 31, 2003, the rate Mon Power paid Allegheny Supply under the Power Supply Agreement, *i.e.*, the price tied to the statutory rate freeze, was considerably below market prices.

### D. PUCO Order of October 22, 2003 Denying Mon Power's Application for Approval of Market–Based Electric Service with Allegheny Supply and Subsequent Orders

In early 2003, Mon Power began a competitive bidding process by initiating Request for Proposals ("RFP") as to a supply of wholesale electricity to be purchased once the Power Sales Agreement with Allegheny Supply terminated. Under the

---

**5.** As an example of the complexity of transitioning from regulation to competition, Mon Power, before its own corporate restructuring, was burdened with supplying its customers at fixed rates through December 31, 2005, while simultaneously receiving other benefits under the Restructuring Act, such as recoupment of transition costs and reduction in state taxes. Because Mon Power had the obligation to maintain fixed rates, its new affiliate, Allegheny Supply, according to testimony, assumed part of this burden through submarket rates chargeable in the Power Sales Agreement. No other supplier of electricity would have any incentive or obligation to assume such burden.

**6.** Section 2.2 of the Power Sales Agreement implements the "Contract Quantity" that Allegheny Supply is obligated to supply and indicates that this amount is equal to all of Mon Power's "Default Service" schedules. That is, incorporating the definition of "Default Service" as it applies in Section 2.2, Allegheny Supply is obligated to supply power at the rates agreed to in the Agreement sufficient to satisfy all of Mon Power's obligations to its retail customers within its Ohio jurisdiction according to state law and the terms of the Settlement.

Ohio Restructuring Act, in furtherance of competition, companies such as Mon Power, which deliver electricity to consumers, are required to shop for wholesale power in a competitive process.

Under the RFP process, Mon Power called for the submission of proposals for a long-term power sales agreement beginning on January 1, 2004 to service its large commercial and industrial customers. The RFP was limited to this class of large commercial and industrial customers.

Mon Power worked closely with the PUCO during the RFP process. Mon Power submitted the RFP to the PUCO for approval before bids were solicited. The PUCO also supervised the evaluation of the offers that were submitted in response to the RFP and confirmed the results of the process to ensure that Mon Power had selected the lowest-priced bid from all of the conforming offers. During this process, the PUCO did not indicate that the market development period for Mon Power's large commercial and industrial customers would end on a date other than what was specified in the Stipulation, December 31, 2003.

Only three power suppliers submitted bids in response to the RFP. Because one of these bids did not conform to the bidding specifications, it was rejected. Of the remaining two bids, Mon Power's affiliate, Allegheny Supply, had the lower bid. This new Allegheny Supply bid and subsequent contract provided for a fixed price for power that was significantly higher than the price set forth in the then-effective Power Sales Agreement which reflected the frozen rates.

On October 8, 2003, Mon Power submitted to the PUCO its Application for the approval of the new one-year fixed-price contract with Allegheny Supply. (Exh. D, "Application.") In its Application, Mon Power sought to confirm new retail rates for its large commercial and industrial customers based on the actual costs that Mon Power would incur under that new contract with Allegheny Supply.

On October 22, 2003, the Commission issued an order denying the request that the new contract with Allegheny Supply be approved. Specifically, the PUCO recognized that Mon Power had previously filed the Stipulation, which provided for frozen rates for industrial and commercial customers through December 31, 2003, and that it had approved the Stipulation in its October 5, 2000 Opinion and Order. (Exh. E, Oct. 22, 2003 PUCO Order, at ¶¶ 5, 6, 19.) The PUCO, however, credited an intervening-party's[7] argument that Mon Power could not, under Ohio Rev.Code § 4928.40(B)(2), end its market development period prior December 31, 2005 without a particular PUCO finding that either the level of shopping in Mon Power's service territory had reach 20 percent or that effective competition existed in the service area. Because no customers had switched to a new electric supplier at the time of the Order and because the RFP process had resulted in only two viable bids, the PUCO determined that neither condition of Section 4928.40(B)(2) had been shown to exist. The PUCO therefore extended the market development period for Mon Power's industrial and large commercial customers through December 31, 2005 and required Mon Power to keep its then-current rates through that date. (*Id.* at ¶¶ 22–23.)

The PUCO's Order caused the new contract between Mon Power and Allegheny Supply to terminate automatically under the terms of the RFP. The PUCO rejected

---

7. IEU–Ohio submitted comments and requested that Mon Power's application be dismissed or in the alternative, that the PUCO stay the proceeding pending the establishment of final rules.

Mon Power's request to establish retail rates sufficient to recover its wholesale costs under the new contract.

On November 21, 2003, Mon Power filed an Application for Rehearing of the PUCO's October 22, 2003 order, which the PUCO denied by Order dated December 17, 2003.[8] Mon Power appealed the PUCO's October 22, 2003 Order and also appealed the Order denying its request for rehearing to the Ohio Supreme Court. That matter is pending.

### E. Mon Power's Purchase of Wholesale Power on Spot Market

After these PUCO orders disapproving the Application, Mon Power contends and the PUCO disputes that the previous Power Sales Agreement with Allegheny Supply expired by its terms. The parties do not dispute that the proposed new contract resulting from the RFP process did not become effective because the PUCO declined to approve it. As a result, Mon Power contends that it is obligated to purchase power at a market price in excess of the rates it is now permitted to charge under the rate freeze. At the same time, Mon Power remains obligated to serve the customers that do not switch to alternative suppliers, including the industrial and large commercial customers at issue in this case. As of January 1, 2004, none of Mon Power's large commercial and industrial customers had switched suppliers.

Since January 1, 2004, Mon Power has purchased wholesale power from Allegheny Supply at spot-market prices to serve this class of customers. These spot-market purchases are made pursuant to a pre-existing contract with Allegheny Supply. This contract and Allegheny Supply's Tariff authorizing the contract have been filed with and accepted by FERC in accordance with Section 205 of the Federal Power Act, 16 U.S.C. § 824d and corresponding FERC regulations.

The prices that Mon Power has paid and continues to pay under this contract with Allegheny Supply are higher than the rates that Mon Power is authorized to charge its large commercial and industrial customers under the PUCO's October 22, 2003 and December 17, 2003 orders. Mon Power's costs to purchase wholesale power at current spot-market prices significantly exceed the frozen retail rates for these customers.

Mon Power's Ohio operations had net after-tax operating revenues of approximately $2.7 million in 2002. Based on cost-projections and daily load forecast values, Mon Power projects that, if the rate freeze remains in effect through December 31, 2005, it will lose between $27 and $35 million in the next two years if it is not permitted to recover the costs of the power its purchases to supply its large commercial and industrial customers. (Plaintiff's Exhibits 4 & 6.) The PUCO, while contending that the earlier fixed-rate Power Supply Agreement is still in effect, has offered no evidence to refute the losses claimed by Mon Power.

### III.

### A.

Under the civil rules of procedure, motions to dismiss for lack of subject matter

---

**8.** In its Entry on Rehearing, the PUCO emphasized that it did not have authority under the Ohio Revised Code to grant Mon Power's request to terminate the market development period on December 31, 2003. While Mon Power raised the issues that the PUCO Order violated the federal filed-rate doctrine and deprived Mon Power of its property rights in violation of the Constitution, the PUCO found that these matters "are issues beyond [its] jurisdiction." (Exh. F, Entry on Rehearing, ¶ 11) (citing *The East Ohio Gas Co. v. Public Utilities Com'n,* 137 Ohio St. 225, 28 N.E.2d 599 (1940)).

jurisdiction fall into two categories: facial attacks and factual attacks. Fed.R.Civ.P. 12(b)(1); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994). A facial attack challenges the sufficiency of the pleading itself. Upon receiving such a motion, the Court must take all of the material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Id.* (*citing Scheuer v. Rhodes*, 416 U.S. 232, 235–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

■■■ In contrast, a factual attack of a pleading under Rule 12(b)(1) challenges the factual existence of subject matter jurisdiction. When a Court is inquiring about whether it has subject matter jurisdiction, "no presumptive truthfulness applies to the factual allegations, *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990), and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Ritchie*, 15 F.3d at 598; *see also RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996). In reviewing such a motion, a district court is free to probe the facts and assess the validity of its own jurisdiction. The Court has a wide discretion to consider affidavits and the documents outside the complaint, and may even conduct a limited evidentiary hearing if necessary. *Ohio Nat'l Life Ins.*, 922 F.2d at 325. The plaintiff bears the burden of demonstrating that the Court has and may appropriately exercise jurisdiction over the subject matter. *RMI Titanium*, 78 F.3d at 1134. The Court may examine evidence of its power to hear a case, and must make any factual findings to determine whether it has jurisdiction. *Kroll v. United States*, 58 F.3d 1087, 1090 (6th Cir.1995); *Rogers v.*

*Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir.1986). A Rule 12(b)(1) motion is not converted into one for summary judgment under Rule 56 when a Court examines evidence for this purpose. *Rogers*, 798 F.2d at 915.

The Court notes that Plaintiff submitted affidavits together with various tables, PUCO Orders, contracts and other documents with its Memorandum in Opposition to the Commissioners' memorandum on subject matter jurisdiction. The parties do not dispute many, if not all, of the dispositive facts in this case. In any event, while it is unclear whether Defendants intend to attack factually the Complaint, neither party requested that the Court take evidence for purpose of the Motion to Dismiss.[9]

## B.

### 1. The Johnson Act

■■■ The Commissioners argue that the Court lacks subject matter jurisdiction because the Johnson Act, 28 U.S.C. § 1342 *et seq.*, divests all district courts of authority to enjoin or restrain the operation of any order affecting rates chargeable by a public utility where jurisdiction is based solely on "repugnance of the order to the Federal Constitution...." 28 U.S.C. § 1342. Alternatively, the Commissioners contend that the Court should abstain from adjudicating this matter so as to permit the state process of judicial review to continue uninterrupted.

The Johnson Act of 1934 provides as follows:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting

---

9. While the evidence taken at the preliminary injunction hearing has not been used for purposes of the Motion to Dismiss, the Court notes that the testimony at the hearing, to the extent any facts remain in dispute, confirmed the evidence submitted with Mon Power's affidavits.

rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342.

Although the statute is framed to provide a broad ban restricting the federal courts from exercising jurisdiction to review most state regulatory decisions pertaining to utility rates, recent decisions have construed the Johnson Act as inapplicable when a plaintiff advances a claim that federal law preempts the actions of a state agency. In Count One, Mon Power contends that the actions of the PUCO conflict with federal law insofar as Mon Power is unable to recoup in retail rates the price it is paying under a rate filed with FERC for wholesale power. To the extent state action is in conflict with a constitutionally enacted federal statute, the federal law preempts the state action under the Supremacy Clause of the United States Constitution.[10]

A number of courts have held that the Johnson Act does not divest district courts of jurisdiction to adjudicate claims that a public utility has, through state action, been unable to recoup in its retail rates the cost it charges for wholesale power under a rate filed with FERC. *E.g., New Orleans Pub. Serv. Inc. v. New Orleans,* 782 F.2d 1236, 1242 (5th Cir.), *modified in part,* 798 F.2d 858 (5th Cir.1986), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987); *Pub. Serv. Co. of New Hampshire v. Patch,* 167 F.3d 15, 25 (1st Cir.1998).

In enacting the Federal Power Act, 16 U.S.C. §§ 824–824m, Congress placed regulatory authority for the establishment of wholesale rates in FERC. In turn, the various states have retained the power to set the actual rates charged to retail consumers of electricity. Federal authority to set such wholesale rates has been described by the Supreme Court as plenary. *Federal Power Comm'n v. Southern California Edison Co.,* 376 U.S. 205, 215–16, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964).

The Commissioners assert that the filed-rate doctrine has no application in this case. First, the PUCO contends that the Power Sales Agreement is still in effect by the terms of the contract itself.[11] Second, the PUCO contends that the filed-rate doctrine only applies to fixed rates, not market rates. The first argument goes to the merits of the controversy, not this Court's jurisdiction. The second raises an important issue which has only been addressed

---

**10.** The Supremacy Clause provides in full:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S. Const. art. IV, cl. 2.

**11.** Summarizing, Defendants argue that the Power Sales Agreement between Mon Power and Allegheny Supply is still in force and therefore Mon Power need not purchase its power on the spot market. As such, the argument proceeds, Mon Power has no claim under the filed-rate doctrine. This argument goes to the merits of Mon Power's filed-rate claim and does not apply in the context of a subject matter jurisdictional analysis.

by a single decision of a district court. *See Pacific Gas & Elec. Co. v. Lynch,* 216 F.Supp.2d 1016 (N.D.Ca.2002).

The question of whether the filed-rate doctrine applies to market-based rates is a close one. Traditionally, the filed-rate doctrine has been applied only to rates actually established by FERC. Only recently has FERC permitted market-based rates. Defendants argue that market-based rates are not included in the filed-rate doctrine and the same does not apply. Mon Power contends that the federal policy of market-based rates preempts state policies which prevent recoupment of market-based wholesale costs.

██ This Court does conclude that Mon Power's claim under the Supremacy Clause is both statutorily and constitutionally based and, thus, cannot be viewed as relying "solely" on repugnance to the Constitution, as required for the Johnson Act to apply. As set forth more fully in the *New Orleans* and *Patch* cases, a filed-rate claim arises as a conflict with the laws of the United States, and, more particularly, with the doctrine of preemption, meaning that the federal action displaces state authority. As such, the claim does not arise "solely" on the "repugnance of the order to the Federal Constitution." The Court agrees that the Johnson Act does not bar a cause of action based on the filed-rate doctrine. *New Orleans,* 782 F.2d at 1242–43; *Patch,* 167 F.3d at 24–25; *see also Pacific Gas & Elec. Co. v. Lynch,* 216 F.Supp.2d at 1029–1038 (exhaustive and thorough discussion of the history of the filed-rate doctrine and determining that it is not a claim based solely on repugnance to the Supremacy Clause but also to a statutory provision such that Johnson Act poses no impediment to award of injunction.)

As noted, *infra,* this Court is issuing relief only under Mon Power's due process claim in Count Two. Consequently, there is no basis upon which this Court should decide whether the filed-rate doctrine applies to market-based rates since a determination of this important question will not affect the relief granted herein.

As to Mon Power's due process arguments, the claim does not challenge a particular PUCO order. The Johnson Act prohibits the district courts from enjoining "the operation of, or compliance with, any *order* affecting rates chargeable by a public utility . . . ." 28 U.S.C. § 1342 (emphasis added). Mon Power challenges the validity of the rate-freeze provisions in the Restructuring Act to the extent that these statutory provisions do not include a mechanism by which a utility can show, if appropriate, that the frozen rates are confiscatory. This distinction is determinative under the circumstances here. Because Mon Power challenges the statute, and not the PUCO orders *per se,* the Johnson Act does not divest this Court of jurisdiction as to Count Two. *See Public Util. Comm'n of California v. United States,* 355 U.S. 534, 540, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958)(Johnson Act does not apply because "the challenge is not to a rate 'order' but to a statute . . . .")

Accordingly, the Johnson Act does not preclude or restrict the Court from reviewing either of Mon Power's claims here. Defendants' motion is therefore denied in this respect.

**B. Abstention**

Defendants also maintain that the Court should abstain from exercising jurisdiction under what are known as the *Younger, Burford* or *Pullman* abstention doctrines. Each doctrine implicates important, but distinct, issues of comity.

██ The doctrine of abstention established in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), requires that a federal court not interfere

with an ongoing state judicial proceeding that implicate important state interests so long as the state courts provide an adequate opportunity to raise the federal claims. *See Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

■ The *Burford* abstention doctrine, derived in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), is premised on related considerations described in *Younger.* The *Burford* doctrine requires abstention where there are difficult and important questions of state law involved that may exceed the importance of the federal lawsuit or where the exercise of federal jurisdiction would be disruptive of the state's attempts to establish "a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)(*quoting Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). *Burford* instructs the federal courts to avoid meddling in complex regulatory matters in which federal issues can be addressed at the administrative level where the expertise lies to develop a record and to consider important local policies. *See Colorado River Water,* 424 U.S. at 814, 96 S.Ct. 1236.

■ *Pullman* abstention, announced in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 500–01, 61 S.Ct. 643, 85 L.Ed. 971 (1941), dictates that a federal court should abstain from the exercise of jurisdiction where the resolution of unclear issues of state law may eliminate the need to decide a federal constitutional issue. The doctrine is based on the sound and well-established principle that a federal court should not decide federal constitutional issues unless it is actually necessary to do so.

The United States Supreme Court addressed the doctrine of abstention as applied to constitutional claims raised by public utilities in *New Orleans Public Service, Inc. v. New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ("*NOPSI* "). In *NOPSI,* the Supreme Court began with the long-observed proposition that "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." *Id.* at 358, 109 S.Ct. 2506. The Court emphasized the right of a plaintiff to choose a federal court and cautioned that this choice of forum " 'cannot be properly denied.' " *Id.* at 359, 109 S.Ct. 2506 (*quoting Willcox v. Consolidated Gas Co.,* 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382 (1909)). Indeed, the Court relied on the indelible principle that " 'the federal courts' obligation to adjudicate claims within their jurisdiction [is] virtually unflagging.' " *Id.* (*quoting Deakins v. Monaghan,* 484 U.S. 193, 203, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988)).

■ The Court held that *Younger* abstention does not apply to state commission orders of a legislative nature. In arriving at this conclusion, the Court determined that *Younger* did not apply to a filed-rate claim because the doctrine only requires deference to proceedings that are judicial in nature. In the context of a filed-rate claim, however, a rate order denying recovery in a utility's retail rates the cost of power purchased at wholesale is legislative in nature. *NOPSI,* 491 U.S. at 369–71, 109 S.Ct. 2506. Accordingly, *Younger* abstention does not apply to such claims.

Similarly, the Supreme Court concluded that *Burford* is inapplicable where a utility can separate its preemption claim from state law and policy questions. The Court held that where "NOPSI's primary claim is that the Council is prohibited by federal law from refusing to provide reimburse-

ment for FERC-allocated wholesale costs .... [F]ederal adjudication of this sort of preemption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an 'essentially local problem.'" *NOPSI,* 491 U.S. at 362, 109 S.Ct. 2506 (*quoting Alabama Pub. Serv. Comm'n v. Southern Ry. Co.,* 341 U.S. 341, 347, 71 S.Ct. 762, 95 L.Ed. 1002 (1951)). The Court also noted that, "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* at 362, 109 S.Ct. 2506 (*citing Colorado River,* 424 U.S. at 815–16, 96 S.Ct. 1236); *see also Patch,* 167 F.3d at 25.

In this case, the Commissioners have not pointed to any difficult state law issue raised by Mon Power's Complaint. The Commissioners rely heavily on the fact that Mon Power has filed a petition for review in the Ohio Supreme Court and maintain that this Court should abstain because Mon Power has this available remedy in the state courts. The Supreme Court in *NOPSI,* however, considered and rejected similar arguments. The Supreme Court recognized that lower federal courts have discretion to withhold relief to avoid unwarranted interference with state proceedings, but discouraged these courts from declining jurisdiction on this basis because "there is no doctrine that the availability or even the pendency of state judicial proceedings excludes the federal courts." *NOPSI,* 491 U.S. at 373, 109 S.Ct. 2506. The Sixth Circuit has similarly held that *Younger* does not apply to a claim that a Michigan Public Service Commission rate order was preempted by federal law in *GTE North, Inc. v. Strand,* 209 F.3d 909, 920–21 (6th Cir.2000). The court reached this decision notwithstanding a pending state court proceedings. In this

case, therefore, the pending Ohio Supreme Court action does not preclude this Court's jurisdiction.

▮▮ Instead, Mon Power claims here that (1) the PUCO order on its face conflicts with Mon Power's right to pass through the cost of power purchased under rates accepted by FERC under the Federal Power Act and (2) that the Restructuring Act on its face violates Mon Power's due process rights because it fails to provide a mechanism to challenge an allegedly confiscatory rate. Both of these claims are distinctly federal and not entangled in complex state laws or local policy issues. *Burford* abstention, therefore, does not apply.

Although the Supreme Court addressed only the *Younger* and *Burford* doctrines in its decision, *NOPSI* provides significant guidance on the application of the abstention principles generally, including *Pullman.* Given the breath of the *NOPSI* decision, and, in particular its admonition that abstention is "the exception, not the rule," this Court is unwilling to apply or extend *Pullman* to abstain from the exercise of jurisdiction which has been properly conferred upon it here.

For these reasons, the Court declines to abstain from these proceedings. Defendants' Motion to Dismiss is therefore **DENIED** as to the doctrines of federal preemption and their statutory counterpart, the Johnson Act.

### IV.

Although the Court declines to abstain from exercising jurisdiction in this case, it is nonetheless sensitive to the fundamental principles of comity which require significant deference to state courts and administrative agencies. Further, this Court is acutely aware of the fact that utility regulation is extremely complex. For this rea-

son, virtually all states, including Ohio, have delegated significant authority to public utility commissions, which have the expertise, staff and experience that courts typically lack. Finally, this Court recognizes that the Ohio Restructuring Act is a complex, broad-based reorganization of the electric industry in Ohio. Only a small part of the Act is implicated by the issues raised in this Court.

Against this backdrop, the Court turns to address the merits of Mon Power's claims for purposes of its Motion for Preliminary Injunction. Count One of Mon Power's Complaint seeks declaratory and injunction relief as a consequence of an alleged violation of the filed-rate doctrine. At its core, the filed-rate claim seeks to enforce the Supremacy Clause of the United States Constitution. Mon Power requests relief under Count One in the form of a declaration that the rate-freeze provisions of the Restructuring Act are inconsistent with the filed-rate doctrine because the statute prohibits the utility from recovering its costs of power to large and commercial customers in its retail rates, and, as such, the statute must fall by operation of the Supremacy Clause. Mon Power presses this claim as its essential cause of action and urges the Court to proceed on its merits to the exclusion, if necessary, of all other claims for relief.

Count Two of Mon Power's Complaint, which it characterizes as an "alternative remedy," seeks declaratory and injunctive relief for alleged violations of the Fourteenth Amendment. Mon Power seeks a declaration that certain provisions of the Restructuring Act are unconstitutional because they provide no mechanism for utilities to demonstrate a need for higher rates in order to obtain a constitutionally sanctioned fair and reasonable return on power investments. As to this claim, Mon Power requests a remand to the PUCO with instructions directing the Commissioners to determine if the rates chargeable are unconstitutionally confiscatory.

Both Counts One and Two arise under the Constitution. The relief Mon Power seeks for each of its claims, however, differs dramatically. The relief sought in Count One would likely disrupt in a significant manner the broad scheme of deregulation crafted by the General Assembly. Thus, the remedy Mon Power seeks under its filed-rate claim substantially heightens the Court's concerns as to issues of comity.

As to Count Two, the relief sought would invalidate the rate freeze to the extent there is no mechanism for a hearing before the PUCO during which Mon Power could attempt to show that current rates are unconstitutional. As to relief under Count Two, the PUCO would consider all appropriate factors—the costs of wholesale power, the offsetting effect of other benefits to Mon Power under the Restructuring Act, and any other relevant considerations—in determining if the rates chargeable are confiscatory and therefore unconstitutional. Further, if the current rates do not permit recovery of validly incurred wholesale power costs, such rates are presumptively confiscatory and unconstitutional. Moreover, as part of this analysis, the PUCO would be required to determine if the original Power Sales Agreement was or was not in effect and, if not, be required to adjust the rates accordingly. Consequently, if relief is granted under Count Two, the relief sought under Count One is essentially moot. The Court therefore finds it appropriate first to address the merits of Mon Power's Motion for Preliminary Injunction on Count Two of its Complaint for a violation of the Fourteenth Amendment of the United States Constitution.

### A.

In determining whether to issue a preliminary injunction, the Court considers

the following four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) the irreparable harm that could result to the movant if the injunction is not issued; (3) the possibility of substantial harm to others if the injunction is issued; and (4) whether the public interest would be served by issuing the injunction. *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir.2001). These four considerations must be balanced and no single factor is determinative. *Id.* A preliminary injunction ultimately preserves the relative positions of the parties until a trial on the merits can be held. *Id.*

### B.

**1. Likelihood of Success on the Merits of Mon Power's Due Process Claim**

■ Mon Power maintains that the rate freeze provisions of the Restructuring Act constitute a facial violation of the Due Process Clause of the Fourteenth Amendment. The Restructuring Act freezes the rates charged by Mon Power and all electric utilities in the State of Ohio during the transitional period to competition, a period of five and one-half years. All such state-imposed regulatory price controls, as a general matter, are presumptively constitutional so long as they are not " 'arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.' " *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 769–70, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)(*quoting Nebbia v. People of State of New York*, 291 U.S. 502, 539, 54 S.Ct. 505, 78 L.Ed. 940 (1934)).

■ Traditionally, public utilities in Ohio have been required to provide service to all customers within a geographic area. Ohio Rev.Code § 4933.82. In part, because of this mandatory obligation to provide service, regulated utilities must be permitted to charge rates that are "just and reasonable." *Id.* at 770, 88 S.Ct. 1344 (*citing Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037 (1942)). That is, to preserve the integrity of the Due Process Clause of the Fourteenth Amendment,[12] state-prescribed rates must allow a utility to recover its costs with a reasonable rate of return on the value of the property being used by the state to provide a public service. *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 593 (6th Cir. 2001). The Supreme Court has described the just and reasonable compensation element that the Fourteenth Amendment is designed to safeguard as follows:

> The guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory. *Covington & L. Turnpike Road Co. v. Sandford*, 164 U.S. 578, 597, 17 S.Ct. 198, 205–206, 41 L.Ed. 560 (1896) (A rate is too low if it is "so unjust as to destroy the value of [the] property for all the purposes for which it was acquired," and in so doing "practically deprive[s] the owner of property without due process of law"); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942) ("By long standing usage in

---

**12.** The Fourteenth Amendment to the United States Constitution provides in pertinent part: Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense"); *FPC v. Texaco Inc.*, 417 U.S. 380, 391–392, 94 S.Ct. 2315, 2323, 41 L.Ed.2d 141 (1974) ("All that is protected against, in a constitutional sense, is that the rates fixed by the Commission be higher than a confiscatory level"). If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments.

*Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307–08, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).

In *Michigan Bell*, the Court of Appeals for the Sixth Circuit recently addressed a due process claim that is virtually indistinguishable in all material respects from Mon Power's claim here. There, the court reviewed Section 701 of the Michigan Telecommunications Act, also a public utility deregulation scheme, which froze local telephone rates during a three year, eight month transition period, unless the Michigan Public Service Commission determined that a requisite number of customers had switched providers or that the rates then charged were demonstrably competitive, 257 F.3d at 593–94.

The Sixth Circuit held in *Michigan Bell* that "[t]he Due Process Clause requires a mechanism through which a regulated utility may challenge the imposition of rates which may be confiscatory." *Id.* at 593 (citations omitted). On this ground, the court determined that the statute was unconstitutional. The court found that Section 701 was constitutionally deficient because it did not "include any provisions

which adequately safeguard against imposition of confiscatory rates." *Id.* at 594.

■ Mon Power has demonstrated a likelihood of success on the merits of its due process claim with respect to its industrial and large commercial customers. The Court notes that the uncontroverted evidence of record thus far with respect to this particular customer base presents at least a colorable showing that the rate cap provisions cause a confiscation of Mon Power's property.[13] Mon Power, however, does not ask the Court to find or declare that the frozen rates are confiscatory as a matter of law. Mon Power maintains that the statute fails because it has no means by which to present a confiscation claim to the PUCO.

The particular provisions of the Ohio Restructuring Act that freeze rates and do not provide a mechanism for Mon Power to challenge its current rates as confiscatory, in particular Ohio Rev.Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40, are unconstitutional. The Act contains no procedural device which would permit the PUCO to determine whether the rates imposed under the Restructuring Act are confiscatory. As such, these provisions of the Restructuring Act violate the Due Process Clause.

The Court recognizes that the PUCO determined it has no jurisdiction to consider Mon Power's argument that the electric restructuring legislation violates the Constitution. (See PUCO Dec. 17, 2003 Order, at ¶ 11.) The effect of this Court's ruling, however, does not require the PUCO to pass on the constitutionality of the Restructuring Act and the corresponding rate cap provisions or to rule on the

---

**13.** Plaintiff's Exhibit 6.0 shows that Mon Power's Ohio operations had net after-tax operating revenues of approximately $2.7 million in 2002 whereas Plaintiff's Exhibit 4 shows that Mon Power is projected to lose between $27 and $35 million in the next two years if it is not permitted to recover the costs of the power its purchases to supply its large commercial and industrial customers.

competitive model of electricity regulation generally. This Court finds that the rate freeze is unconstitutional to the extent the PUCO may not examine whether the frozen rates are confiscatory. Consequently, the PUCO is directed to determine whether the fixed rates imposed under that Act are confiscatory and to hear, in the first instance, Mon Power's confiscation claim. This Court does not find that the fixed rates for electricity during the transition period are confiscatory as a matter of law or that Mon Power has or has not recovered the costs of wholesale energy in the retails rates is it permitted to charge its large commercial and industrial customers. These are matters to be determined by the PUCO.

In addition, the PUCO did not decide whether the old Power Supply Agreement was still in effect when it rejected the new contract with Allegheny Supply. Instead, the PUCO held that it could not approve the contract which includes terms in conflict with the rate freeze provisions of the Ohio Restructuring Act. Because these provisions have now been declared unconstitutional, the PUCO must, incident to its residual rate making authority, address whether the old Power Supply Agreement is still in full force and effect.

In the absence of those provisions of the Restructuring Act which freeze rates from July 6, 1999 through December 31, 2005, the PUCO has authority to set rates charged by Mon Power to its industrial and large commercial consumers. Ohio Revised Code § 4950.04 vests the PUCO with the power to regulate electric utility companies. Ohio Revised Code § 4909.15 directs and authorizes the PUCO to fix and determine rates.

■■■ The Court emphasizes that its determination that the rate-freeze provisions are unconstitutional for failing to provide a mechanism by which a utility may present a confiscation claim leaves the remainder of the Restructuring Act intact. In considering whether the unconstitutional portion of a statute may be severed from the valid portion, the question is whether the legislature, if partial invalidity had been foreseen, would have intended the statute to be enforced with the invalid part redacted. In this instance, Ohio law provides the answer to the legislature's intent in this regard. Ohio Rev.Code § 1.50 codifies the legislative mandate to favor separability:

> If any provision of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.

Ohio Rev.Code § 1.50.

The PUCO is therefore, under Ohio Revised Code § 4909.15, authorized to set rates. In finding the rate freeze provisions of the Restructuring Act unconstitutional, this Court directs the PUCO to exercise its residual authority to set rates and determine whether the rates chargeable by Mon Power are confiscatory.

■■■ Defendants have also argued that the Restructuring Act provided a range of other financial benefits accruing to Mon Power, including tax reductions and transition costs which should be considered as offsets against the harm of a rate freeze. If other benefits of the Restructuring Act exceed the economic harm caused by the rate freeze, the Defendants argue that the rate is not confiscatory. This Court agrees. As noted in *Duquesne Light Co. v. Barasch,* " '[i]t is not the theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry ... is at an end.' " 488 U.S. at 310, 109

S.Ct. 609 (*citing Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). If the combined effect of all aspects of the Restructuring Act provides Mon Power with a rate which is not confiscatory, the rate freeze is not unconstitutional. Again, the PUCO is in a much better position to weigh and analyze all component parts of the Restructuring Act and to determine the overall effect on revenues by the Plaintiff following enactment.

The Court concludes that the PUCO must consider Mon Power's confiscation claim to determine if the expense of providing a mandatory service to the public is being properly allocated. To the extent that the Restructuring Act fails to provide a mechanism for Mon Power even *to present* such a claim and for the PUCO to hear it, the statute suffers from the same defects that the Sixth Circuit categorically struck down in the *Michigan Bell* case. This holding reflects an appropriate measure of deference to the state-selected regulatory scheme for retail electric rates and to the PUCO, the governmental agency vested with the expertise to aptly address all of the particularized complexities inherent in constitutionally sound rate-making. Concomitantly, Mon Power's due process rights are protected to the extent it now has a device by which it may challenge the imposition of rates which may or may not be confiscatory.

In summary, Mon Power has demonstrated a substantial likelihood of demonstrating that Ohio Rev.Code §§ 492834(A)(6), 4928.35(A) and 4928.40 are unconstitutional.

**2. Irreparable injury**

Mon Power has demonstrated a likelihood of irreparable injury. From a pecuniary perspective, Mon Power has incurred costs to purchase power at wholesale to fulfill its mandatory obligation to provide power to commercial and industrial customers that it is not recovering through its retail rates. Mon Power incurred losses on all of its sales to this class of customers, calculated at $1.7 million from January 1, 2004 through February 14, 2004. (Menhorn 3/15/04 Tr., pp. 52–53; Exh. 1.L.) Mon Power projects that it will continue to incur losses in supply its large commercial and industrial customers throughout the rate-freeze period ending December 31, 2005. These losses approach $35 million for this two-year period. (*Id.*, Pl's Exh. 4.) [14]

Further, the PUCO cannot order a retroactive rate increase to effect an adequate remedy for Mon Power. *See, e.g., Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel., Co.*, 166 Ohio St. 254, 141 N.E.2d 465 (1957). The inability to implement retroactive changes in rates or otherwise

---

14. The PUCO argues that these projected losses are "sheer speculation," and contends that the costs of wholesale power could potentially decrease making any projections hypothetical at best. First, the evidence of injury that Mon Power presented regarding losses through February 14, 2004 is supported by documentation and testimony presented at the hearing. Second, Defendants offered no evidence to contradict Mon Power's showing through evidence relating to spot market pricing, general market conditions and corporate forecasts that it has consistently suffered losses and that a strong likelihood exists for a continua-

tion of these or similar losses. The Court notes that it is only considering whether a preliminary injunction should issue. The factual findings made are to determine whether preliminary relief should be granted. While this Court finds that relief under Count Two is appropriate, the preliminary findings made in this decision apply only to the question of whether the Ohio statute fails to provide a constitutional review mechanism. It is for the PUCO to then apply these principles to actual claims hereafter asserted by Mon Power.

adjust past rates wholly impairs Mon Power's ability to recover its losses.

Although arguably Mon Power may recoup its losses prospectively from its customers by raising its rates, the Sixth Circuit in *Michigan Bell* instructs that "even if higher rates and fees to not drive customers away, loss of established goodwill may irreparably harm a company." *Michigan Bell*, 257 F.3d at 599 (*citing Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.1992); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140 (7th Cir.1994)). The record here amply supports a finding that Mon Power will be similarly harmed if it is forced in the future to raise the rates it charges to its customers to recoup its substantial projected losses.[15]

### 3. Harm to Third Parties

The PUCO maintains that an injunction would have a direct, immediate and negative effect on Mon Power's commercial and industrial customers in the form of a substantial rate increase. The PUCO also argues that the injunction would injure electric consumers beyond Mon Power's service area throughout the State of Ohio because an injunction would enjoin enforcement of the rate cap provisions whatever the parties or circumstances and eliminate the only restraint on electric rates.

The PUCO's arguments, however, overstate the impact of the Court's injunction. Mon Power has not requested such relief and, this Court has not declared the entire Restructuring Act unconstitutional. The Court has concluded that Mon Power is entitled to present a confiscation claim to the PUCO; the reach of this holding is designed to be narrow. Any rate increases that Mon Power's large commercial and industrial customers may experience would result from the correction of the retail rates to a constitutional, just and reasonable level after a PUCO determination of Mon Power's confiscation claim. No third party has a right to rely upon a confiscatory rate and no party may benefit from the violation of another party's constitutional rights. *See Stile v. Copley Township*, 115 F.Supp.2d 854, 866 (N.D.Ohio 2000)("where constitutional rights have undoubtedly been violated, the interests of third parties ... have little or no relevance.")

### 4. Public Interest

Finally, the Court must assess whether the issuance of a preliminary injunction will serve the public interests. Here, Mon Power has made a sufficient demonstration that the rate freeze provisions of the Restructuring Act violate the Due Process Clause insofar as they fail to provide a mechanism for presenting a confiscation claim. The public interest therefore would

---

15. The PUCO also argues that no harm will befall Mon Power because its parent company, Allegheny Power Company, will not face a net loss because any loss to its subsidiary, Mon Power, will be a gain to its other subsidiary, Allegheny Supply. The PUCO's contention, however, is undermined by the fact that the Restructuring Act itself obligated Ohio utilities to create and implement corporate separation plans to divide the various business operations such as generation and supply. To the extent the PUCO makes an argument that the Court should, in effect, pierce the corporate veil, it has offered no evidence by which this Court could do so. The evidence of record, which is uncontroverted, demonstrates that all the various entities under the Allegheny Power Company umbrella function as independent corporations and operate with separate employees, officers and boards of directors. Under these circumstances, the Court has no factual basis upon which to pierce the corporate veil and treat Mon Power and Allegheny Power as the same entity.

be readily served by the Court's injunction to prevent enforcement of these unconstitutional provisions of the Act. *Michigan Bell*, 257 F.3d at 599–600 (*citing Planned Parenthood Assc. of Cincinnati Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir.1987)(recognizing that "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional")).

The public interest is always served by the prevention of a violation of the United States Constitution. *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.1994). Consequently, the Court concludes that issuing its injunction to eliminate an unconstitutional effect of the Restructuring Act furthers the public interest.

### V.

The PUCO's Motion to Dismiss for Lack of Subject Matter Jurisdiction is **DENIED.** Mon Power's Motion for Preliminary Injunction is **GRANTED IN PART,** as to Count Two of its Complaint **and DENIED IN PART AS MOOT** with respect to Count One.

**IT IS THEREFORE ORDERED AND DECREED THAT:**

1. The provisions of the Ohio Restructuring Act, Ohio Rev.Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40, which freeze rates through December 31, 2005 without provision for a mechanism to adjudicate claims of confiscatory rates are unconstitutional; and

2. The PUCO is directed to consider and adjudicate claims by Mon Power that the frozen rates are confiscatory.

**IT IS SO ORDERED.**

### OPINION AND ORDER ON MOTION FOR RECONSIDERATION

This matter is before the Court upon the Motion of the Plaintiff, Monongahela Power Company ("Mon Power") for Expedited Reconsideration. For the reasons that follow, the Motion is GRANTED in part and DENIED in part.

### I.

On May 19, 2004, this Court issued an Opinion and Order in which it declared unconstitutional certain provisions of the Ohio Restructuring Act, specifically Ohio Revised Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40, insofar as no provision is made for a mechanism to adjudicate claims of confiscatory rates during a five and one-half year rate freeze. The Court directed the Public Utilities Commission of Ohio ("PUCO") to consider and adjudicate claims by Mon Power that its frozen rates were confiscatory. Further, this Court denied as moot Mon Power's claims set forth in Count One of its Complaint that the action of the PUCO violated the filed-rate doctrine, which requires a pass through and recovery of the wholesale costs of electricity as either determined or permitted by the Federal Energy Regulatory Commission ("FERC"). The Court found that the issues raised in Count One may be rendered nugatory by the PUCO in its analysis of whether the rates chargeable by Mon Power were in fact confiscatory.

Thereafter, Mon Power filed its Motion for Expedited Reconsideration. The Motion makes two challenges to the Court's original Opinion and Order. First, Mon Power contends that the PUCO does not have the power to construe the Power Supply Agreement between Mon Power and its affiliated supplier, Allegheny Energy Supply Company, LLC ("Allegheny Supply"). Second, Mon Power contends that its claim that the PUCO has acted in

violation of the filed-rate doctrine is not moot and must be adjudicated by the Court. Memoranda in Opposition to the Motion of Mon Power has been submitted by the Defendants, together with *amicus curiae*, Industrial Energy Users—Ohio.

## II.

██ Mon Power first contends that the Court erred in holding that "the PUCO must, incidental to its residual rate making authority, address whether the old Power Supply Agreement is still in full force and effect." Order at 27–28. Mon Power contends that the PUCO has no authority to determine whether the Power Supply Agreement is enforceable under Ohio contract law. The Court finds that the precise argument made by Mon Power is correct and that the language of the Opinion erroneously directed the PUCO to exercise authority which is arguably does not possess.

It was, and is, the Court's intention that the PUCO engage in its traditional role of considering all relevant costs and expenditures made by Mon Power in setting a rate which is not confiscatory, as more specifically explained in the Court's original Opinion and Order. *See* Order at 25–26. In the course of such analysis, the PUCO has always had the authority to disallow any unreasonable expenditures which did not ultimately benefit electric-power customers. While retaining such authority to disallow expenses incurred under contract, the PUCO has not been granted the authority to adjudicate whether contracts were or were not in effect under Ohio law. *Marketing Research Serv., Inc. v. Pub. Util. Comm'n.*, 34 Ohio St.3d 52, 56, 517 N.E.2d 540, 544 (1987). By way of an example, a regulated public utility may have agreed in a written contract to compensate its chief executive officer in an amount larger than the PUCO may subsequently determine to be reasonable. In such circumstance, the PUCO may disal-low the pass-through of such compensation through to the electric utility's customers. Such action would not, however, invalidate or otherwise prevent the enforcement of the employment contract between the CEO and the regulated utility.

In the Court's prior Opinion and Order, such distinction was not recognized. Therefore, the original Opinion and Order is modified to the extent that the PUCO is now directed to use its traditional rate-making authority to consider whether the pass through of costs incurred under the Power Supply Agreement is permissible.

## III.

Mon Power next contends that the Court erred in finding its claim that the PUCO violated the filed-rate doctrine is now moot. In the original Opinion and Order, this Court held that the relief under Court Two was intimately related to the claim made by Mon Power as to Count One. If Mon Power is, for example, unable to recover under a future rate as determined by the PUCO, its costs of wholesale power, such circumstance may establish that the rate is unconstitutionally confiscatory. Thus, the remedy afforded Mon Power under Count Two may very well result in effective relief as regards to its claims under Count One.

Mon Power contends that this Court may not decline to adjudicate a federal claim which it contends is not moot. According to Mon Power, the relief granted as to Count Two does not address the filed-rate claims set forth in Count One.

██ This Court disagrees with Mon Power's assertions. It has long been held that a Court should not ". . . pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v.*

*Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandice, J., concurring), *see also Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *United States v. National Treasury Employees Union*, 513 U.S. 454, 478, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

While this Court did adjudicate Count Two on constitutional grounds, as denoted in the original Opinion and Order, the Court deliberately began its analysis of Plaintiff's claims under Count Two so as to accord due regard to principles of comity and administrative expertise. The Court sees no reason to depart from such course. As previously ordered, the PUCO may entertain and adjudicate a claim by Mon Power that the rates it is currently able to charge its industrial and large commercial consumers are confiscatory. Incidental to such rate making is consideration of Mon Power's claims regarding its alleged inability to pass through the costs of power it has purchased from Allegheny Supply. Therefore, in the course of such proceedings, the issues raised by Mon Power in Count One may very well be adjudicated in its favor.

Moreover, this Court is also concerned that the PUCO have the opportunity to conduct what is termed a *Pike County* analysis. *See Pike County Light and Power Co.—Elec. Div. v. Pennsylvania Pub. Util. Comm'n*, 77 Pa.Cmwlth. 268, 465 A.2d 735 (1983); *See also Public Serv. Co. of New Hampshire v. Patch*, 167 F.3d 15, 27 (1st Cir.1998) (citing *Pike County* with approval); *Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Comm'n* (3d Cir.1998).[1] Under the *Pike*

*County* analysis which is somewhat of an exception to the filed-rate doctrine, the PUCO has the authority to determine whether cheaper alternatives of wholesale power were available to Mon Power. If this Court were to simply grant the relief requested by Mon Power under Count One, it would effectively deprive the PUCO of its *Pike County* discretionary authority.

This Court does conclude that it should retain jurisdiction with regard to Count One in order to determine, after a future decision by the PUCO, whether Mon Power may still be entitled to relief under such claim.

### IV.

Based upon the foregoing, the Court's Opinion and Order issued on May 19, 2004 is modified in two respects. First, the PUCO is directed to engage in rate-making activities as described in both this Order and the Court's previous Opinion and Order. Rather than determine whether the Power Supply Agreement is still in effect, the PUCO shall instead exercise its traditional rate making authority to determine whether reasonable costs incurred in the purchase of wholesale power result in a rate which may be confiscatory. Second, this Court retains jurisdiction over Count One of the Complaint, pending further decision of the PUCO.

### V.

Pursuant to Fed.R.Civ.P. 65(c), Mon Power shall post $250.00 as security for

---

1. While the Supreme Court has never specifically adopted the *Pike County* exception to the filed-rate doctrine, it has in two cases assumed for sake of argument that such exception exists. *Mississippi Power & Light Co. v.*

*Mississippi*, 487 U.S. 354, 373–74, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 972, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).

the previously entered preliminary injunction.

IT IS SO ORDERED.